By petition dated February 22, 1995 the Department of Children and Family (DCF) seeks to terminate parental rights of the mother and father of the minor child Tiffany L. born on August 17, 1993. The mother of the minor child is Michelle L. and the father of the minor child is Richard M. During the course of the proceedings the mother signed a consent form agreeing to CT Page 7924 termination of her parental rights. The court (Mulcahy, J.) canvassed the mother and found that the consent had been knowingly and understandably made with the advise and assistance of competent counsel. Thereafter the case was transferred from the Superior Court for Juvenile Matters in Rockville to the Child Protection Session. In order to insure that the father had notice of the pendency of the proceedings in the Child Protection Session, a notice was published in a paper circulating in the community of his last known place of address. Counsel for the father also made an effort to locate him. The father failed to appear on August 30, 1996, the date and time set for a contested hearing on the termination of his parental rights. The court heard testimony at that time and under date of September 3rd, 1996 the court entered an adjudication finding by clear and convincing evidence that the father Richard M. had failed to maintain a reasonable degree of interest, concern, or responsibility for the child and had abandoned the child as that term is defined by Sec. 17a-112(b) 1 and, further, that the father has no ongoing parent-child relationship with the minor child as that term is defined in Sec. 17a-112(b)(4) of the General Statutes. Having received a consent from the mother and having found grounds to exist for the termination of the father's parental rights the matter was continued for a dispositional hearing which commenced on September 25th and continued on various dates until October 4th consuming four days of testimony. On the first day of the dispositional hearing, The attorney for the father asked to be excused, as did the attorney for the intervening maternal grandmother. Both counsel indicated that their client's interests were protected by the maternal grandmother whom they believed should raise the child, Tiffany. The hearing commenced with the child's mother present as was her attorney, the child's attorney, the maternal grandmother and her attorney, the foster parents and their attorney and the Assistant Attorney General representing the petitioner.
The principal concern of the litigants during the dispositional phase of the case was not whether the parental rights of Michelle and Richard should be terminated, indeed all of the litigants agreed that it would be in the best interest of Tiffany to have the termination of parental rights granted as to the biological parents. The principal issue in dispute relates to whether the child should be placed with the maternal grandmother, Norma or remain with the foster parents with whom the child is emotionally and psychologically bonded.
Many aspects of this case are uncontested. The female biological parent of Tiffany is Michelle L. Michelle was born in Manchester, Conn. to Norma and Earl L. on September 20, 1965. Michelle grew up in Manchester and South Windsor area where she had four siblings, two older half-sisters from her mother's first marriage, a full sister from her mother's second marriage to CT Page 7925 Mr. L and a younger half-brother from her mother's third marriage. Michelle has had a chronic history of poly-substance abuse beginning at age 13. She has been offered virtually every program available through the Dept. of Children and Families and the Probation Dept. of the State of Conn. as well. She has been at the Altobello Hospital, Mount Sinai ABC unit, New Hope Manor Group Home and Long Lane School. She has been in treatment programs at the John Dempsey Center, the Southington Institute, the Benjamin Rush Detoxification Center, the Zamborano Treatment Center in Rhode Island, the Talbot House, Providence Hospitals Chemical Dependency Program for Women and Infants, the Institute for Living, Blue Hills and Rushford House. For all of Michelle's problems with substances she recognizes, to her credit, that she is not able to care for children and as a consequence none of the four children that have been born to her are in her care. Her first two children, Melissa born on September 29, 1984 and Danielle born on October 2, 1990, are with the maternal grandmother Norma. Tiffany, the third child born to Michelle, was born on August 17, 1993. She was placed with Norma for three months until she was removed and placed in a foster home where she has remained for the past three years. After Tiffany was born Michelle had yet a fourth child, Rachel born on September 27, 1995. This child is now residing with the maternal grandmother Norma pursuant to a transfer of guardianship in the probate court to the maternal grandmother. It should be noted that the first two children Melissa and Danielle have been adopted by the maternal grandmother.
The male biological parent of Tiffany, Richard P. M. Jr., was born on July 16th, 1962. When first notified of the birth of Tiffany the reaction of the male biological parent was to deny paternity. Subsequently during the course of these proceedings paternity testing confirmed that he is the father of Tiffany.
Richard M. was raised in foster homes himself. He has a criminal history including convictions of assault, burglary violation of probation and a sexual assault in the first degree arrest which has resulted in a plea to the offense of unlawful restraint and to his subsequent incarceration at the Osborne Correctional Facility in Somers, Conn. Richard M. has admitted to a past history of alcohol and drug abuse. Following his release from the Correctional Center in August of 1995 he visited the child Tiffany on one occasion and even though numerous attempts were made by DCF to orchestrate further visitations, he has not seen the child in over a year and he is not cooperating with DCF with respect to his current address or his present life situation. He has made no effort in over a year to see or learn of the child's well-being. As indicated earlier the court found on Sept. 3rd that grounds exist to terminate his parental rights. CT Page 7926
Tiffany was born on August 17, 1993 and tested positive to cocaine. Upon her discharge from the hospital she was placed with the maternal grandmother, Norma. She remained with Norma until Dec. 27, 1993 when Tiffany was removed from the maternal grandmother's home and placed in the foster home where the child presently resides.
The maternal grandmother seeks a return of Tiffany to her home so that Tiffany may join her siblings who are in the care of the maternal grandmother. The maternal grandmother is angry at the Department of Children Families which she views as having wronged her and the child by removing the child from her home. Much of the testimony in the course of the trial was focused on justifying her conviction that she has been victimized by DCF. Indeed, she offered in evidence a letter that she wrote to President and Mrs. Clinton as well as to TV host John Walsh of a television program called America's Most Wanted. While her letter to the White House was to complain about her plight in life and the "ignorance of our state social workers . . .", the purpose of the letter to America's Most Wanted is not readily apparent.
On August 30, 1993 Norma petitioned the Probate Court in South Windsor for guardianship of Tiffany. In her testimony in court Norma explained that the case was transferred from South Windsor to East Hartford because "they accused the judge of having an affair with me so they moved it. . . . .". According to Jennifer Julian the DCF caseworker, the principal reason for removing Tiffany from Norma's home was that Norma was preventing Tiffany's mother, Michelle, from frequent contact with the child. DCF was of the opinion that this placement with the maternal grandmother was a temporary arrangement so that Michelle could maintain her sobriety and ultimately be reunified with the child. Regarding the same early months of Tiffany's life Michelle testified that September 8, 1993 was her date of sobriety and DCF expected her to be sober for a year free of all drugs and alcohol at which time it was hoped that she would regain custody of her child. Michelle testified that when she would visit her mother's house Norma would not let her hold the child, she would say I just fed the child, she wouldn't let Michelle have anything to do with the child, she was extremely controlling and would not permit Michelle opportunities to bond with the child.
Michelle indicated that it was her request to the DCF authorities to have Tiffany removed from her mother's house, . . . . "no one else". Michelle testified further that once the child was removed from her mother's house the foster parents were very accommodating. She felt comfortable there and was able to visit in accordance with the DCF schedule. Michelle indicated that at all times whenever she was trying to maintain her sobriety she believed her mother would do whatever she could CT Page 7927 to undermine and sabotage her sobriety.
During the time that Tiffany was living with her maternal grandmother the DCF caseworker, aware of the conflict and tension between Norma and Michelle, made efforts to try alternate arrangements for visitation so that Michelle did not have to visit in her mother's home. Each plan for alternate visitation was refused or opposed by the maternal grandmother. Norma indicates her car was not reliable and that she couldn't drive to a place for visitation, she further complained that she did not have enough control, she would not accept visitation at Michelle's apartment, at the local McDonalds restaurant or at a local park. The maternal grandmother was further upset that her adoptive children, Michelle's natural children, would call Michelle "Mom". The DCF social worker further indicated that in telephone conversations with the maternal grandmother; Norma would call her daughter "a drug addict", "a liar" and other derogatory terms while her adoptive children were in her presence. The social worker believed that this was not healthy for the children to hear the maternal grandmother calling their natural mother names.
It was during this period of time that the maternal grandmother announced her intention to move to Florida. She indicated to the social worker that she was not going to give her daughter the address and not allow her to have any visitations ever again. The maternal grandmother during the same period of time while Tiffany was living in her home would frequently call DCF to complain about Michelle. The maternal grandmother indicated that she was following her daughter around, video taping her daughter's activities so that she could prove that her daughter was a failure and that she had relapsed. Norma indicated to the social worker that she wanted her daughter imprisoned for the rest of her life. Given the great hostility existing between the mother and maternal grandmother, the breakdown of visitation, and the lack of opportunity for parent/child bonding, all of which frustrated the state and federally mandated efforts at reunification, DCF made an entirely appropriate decision to remove the child from the home of the maternal grandmother.
From Sept. 1993 on to May 1994, Michelle was making significant progress in her efforts to stay sober. Michelle herself was pleased with her level of visitation and involvement with Tiffany. She was also pleased with her own efforts at recovery. Michelle was involved in Manchester Out Reach Substance Program, she had completed parenting classes, she was going to Alcohol Anonymous and it is believed that her probation officer was doing drug screens on her. Her visitation was increasing. She was seeing Tiffany regularly and DCF was preparing her for unsupervised week-end visitation. CT Page 7928
During this period of time Michelle was receiving a great deal of support from Norma's sister, Michelle's aunt, Sandra H. There was testimony that Sandra was a recovering alcoholic and a person in whom Michelle could trust and confide. In 1994 Sandra was not speaking with her sister Norma; they had been estranged for a period of several years. Sandra age 53, was very helpful and supportive to her niece. Sandra was the first to know when Michelle had a relapse and began using drugs and alcohol again. It was Sandra who contacted DCF and notified them of Michelle's relapse in May 1994.
From the time Tiffany was born Norma would call the DCF to report very negative things about Michelle and the social worker indicated that Norma never called to say that Michelle was making progress or doing well with her sobriety. Norma regularly called to report that Michelle was drinking or doing drugs. On one occasion known to the social worker, Norma told Melissa, the oldest adopted child, that her mother was "was a drug addict and hated her". From time to time Norma would tell the DCF worker that they (DCF) were "stupid". Norma never called to inquire about the child's development or well being, only to report negative observations about Michelle. This is very consistent with Michelle's belief that her mother was sabotaging her efforts at remaining sober. The social worker indicated that the maternal grandmother would call DCF to notify them of unauthorized or visits between Michelle and her daughter Tiffany that extended beyond the normal time limits for visitation. One of these allegedly "unauthorized" visits happened when the foster parents took Tiffany to a fast food restaurant where Michelle was working on Easter Sunday so that Michelle would be able to see how pretty Tiffany looked dressed up in her Easter outfit. Norma apparently found out about this "unauthorized" visit and notified DCF. The court is mindful of the fact that at the time of that "unauthorized visit", the foster parents were required by law to cooperate with the natural mother to aid in a possible reunification. This thoughtful and considerate gesture on the part of the foster parents was viewed by the maternal grandmother as a violation of a DCF regulation. At this point it is appropriate to review the social history of the maternal grandmother. Norma reports to being 54 years of age and having been raised in Manchester where she attended school until her sophomore year. After she quit school Norma entered into a series of extremely dysfunctional, abusive relationships with alcoholic men.
On October 23, 1959 she married Carlos O. From this marriage she had two children, Leona and Sharlene. Carlos had a significant criminal history and was an alcoholic. Norma testified her husband once padlocked her into an apartment and her brother and her father had to come and free her from her apartment. She indicated that Carlos had been in CT Page 7929 a school for boys, his criminal record included theft and grand larceny, he had a severe drinking problem, he was abusive to her and he never saw the children. She divorced him in 1962.
She thereafter married Gerald L. on February 14, 1963. Norma had two children from this union, Angela and Michelle. Norma described Gerald as a closet alcoholic and a gambler. He would come home drunk occasionally and was physically abusive to her. When Gerald's parents came to visit them, Norma would have to hide Leona and Sharlene, her children from the prior marriage, because Gerald didn't tell his parents that his wife had two children. This marriage lasted until 1966 when Norma divorced Gerald because of his drinking and physical abuse.
In 1972 Norma was working for a Holiday Inn in Connecticut. She rented a house on Belmont Street in South Windsor from one Raymond M. By this time her prior husband Gerald L. had left Connecticut and moved to Sarasota, Fla. For reasons not explained Norma decided to move herself and her four children to Sarasota, Fla.. Norma indicates that while she was living in Florida her second husband Gerald came to the home where she and the children were living. While his young daughter Michelle was taking a shower, Gerald went into the shower after her. Norma indicates that he was drunk. Michelle was about 7 or 8 years old at the time. Shortly after this episode Norma decided to move with her daughters back to Conn.
Norma again rented a house in South Windsor from her former landlord, Raymond M. Norma reports that Raymond was obsessed by her. She indicates that he used to stalk her and he kept a gun in the car. Norma reports that Michelle, who was then her youngest child and was about 7 years of age, regularly slept in bed with her. Norma testified that her landlord, Raymond M. entered the rented house late one night and raped her in front of her children. Apparently he had a key to the house which he used to gain entry and assault Norma to the great distress of her and the children. Norma reports that Leona was kicked in the crotch by Raymond with a steel toed boot while the girls were trying to get him off of their mother.
Subsequently Norma discovered that as a result of the rape she was pregnant. She reports further that since she was Catholic and the child "needed a name" she thereafter made Raymond marry her. Norma reports that she bought the wedding license. Significantly, she named her first, and only son, Raymond M. Jr.
Michelle, in discussing Raymond, her first stepfather, indicates that they would go stealing things together, they would go for rides in his truck and find things to steal. She said she was scared of him, he was big and mean and he would call the girls names and hit her. Michelle told CT Page 7930 Dr David Mantell, the court appointed psychologist, that while her mother was at work, Raymond would beat her up and he would kick her in the crotch. She said she slept with a meat cleaver under her pillow because of her fear of him. When she reported these things to her mother Michelle indicates that her mother never believed her but she always believed Raymond. Norma stated at the trial that she subsequently decided to divorce Raymond because she discovered that while she was at work he was "abusing my children, all four of my daughters and myself".
Norma married a fourth time in May of 1986 to Mr. Robert B. The social study introduced at trial (petitioner's Exhibit 1) indicates that Mr. B has an arrest record for possession of drugs in 1970, assault 3rd in 1985 and criminal trespassing and disorderly conduct in 1985. Mr. B. is 65 years of age, being 11 years older than Norma. He has had bypass surgery on two occasions, he is slightly hearing impaired and Norma has instituted divorce proceedings against him on two prior occasions. They have been separated twice for very long periods of time.
There is yet a fifth male in Norma's life. This individual is Dick H. He has been a long standing acquaintance. Michelle indicates she has observed her mother holding hands with him and sitting on his lap and kissing him and that she considers Dick to be her mother's boyfriend. Michelle indicates that she has gone drinking with her mother and Dick. Dick used to live in the same house as Norma and her husband and in fact remained in the house with Norma after her husband left. Mr. B was living in R.I. or living in East Hartford for approximately a year and a half. Subsequently Dick H. moved to Florida and thereafter in Feb. of 1996 Norma and her husband moved to Florida. Norma has returned to Conn. on a couple of occasions for visits and Dick H. accompanied her back to Conn. on at least one of these occasions. Her husband did not accompany them back to Connecticut. Dick H. lived with Norma and her husband or alone with Norma for two years. He moved to Florida in 1993. Norma indicated that her children always say "I had an affair with him, but they think every man is in love with me".
Norma had five children by three different men. Three of her daughters have had a history of alcohol or substance abuse and have lost custody of their children. A fourth daughter Angela, is married to a person in the military service and she does not communicate with her mother. Angela moved out of Norma's home and went to live with her natural father as soon as she reached 18.
The youngest child of Norma, Raymond M. Jr., is now 21 years of age and apparently lives with Norma. This is the only one of Norma's children whose relationship with her was not challenged in court. All of her daughters CT Page 7931 have been estranged from her.
Michelle's aunt Sandra testified that Michelle is a chronic drug user, Sharlene is a chronic liar, and that Leona was 16 when she began drinking and using drugs. When asked how Norma would do parenting young Tiffany, Sandra responded that she is raising Danielle and Melissa the same way she raised her other children.
Norma's testimony indicated that she lacked affection, support or understanding for her daughter Michelle. Michelle testified that as a child her mother made her kneel on hard peas in a corner, that she disciplined harshly with a paddle or belt, that she would pull the children by their hair and verbally and emotionally abuse them indicating on some occasions, "I wish I never had you four brats". When Michelle was 12 or 13 she began to strike out and became a behavioral problem. At one point when Melissa was 13 she ran away and went to North Carolina with a friend she had met at the psychiatric unit at Mt. Sinai Hospital. Michelle was raped by a stranger in Washington, DC. When she returned home her mother, Norma, called her a slut and a whore and shipped her off to live with her natural father's brother and his wife in Texas. Michelle stayed there for a month or so.
Throughout her testimony Norma stated frequently that her children totally embarrassed her. She used the words "embarrassed" or "ashamed" of her children very frequently during her testimony. Norma explained her many husbands and relationships with men as follows: "every one of my daughters resented every man in my life". When asked how she thought she did raising her children she said, "I thought I raised my four daughters . . . let me say this, I wish I had the opportunities I gave my four daughters." In response to a question by Michelle's attorney "Would you say that three of your husbands exposed your children to unnecessary abuse and conflict? Norma said, "Most of the abuse came from my children, I was abused by my own children". The court is extremely concerned about the maternal grandmother's disturbing lack of understanding and insight into the causes for her own children's behavior, as well as her lack of awareness of and appreciation for the problems created by her own numerous dysfunctional relationships with abusive men. It appears that Norma has failed to complete her own education, has failed in her many relationships with men and failed in her parental role and is now seeking an opportunity to parent yet another child without ever taking steps to understand her prior failings and parental shortcomings.
The court appointed psychologist described Norma as "a magnet for social dysfunction". Dr Mantell indicated that Norma externalizes all blame. She does not accept any responsibility for the failure of her CT Page 7932 marriages or the dysfunctional conduct of her children. She portrays herself as the victim of her husbands and her children. She is seen as an extremely dominating personality, self sacrificing, martyr-type person whom she believes is often misunderstood by others. Dr. Mantel concluded that Norma's core experiences will persistently compromise her ability to provide a wholesome psychological environment for children.
As indicated earlier, Tiffany was removed from Norma's care on December 27, 1993. She has been with the same foster family ever since. Tiffany was four months old when she first arrived at the foster family. Originally the foster mother was anxious to work with Michelle to reunify the child with her. There was testimony that sometimes the foster mother would allow additional time for Michelle to be with Tiffany and that the plans for reunification were going very well. Between January and May, 1994 Michelle was visiting as often as possible and making good progress on her recovery from abusing substances. In mid-May 1994 Michelle had a relapse and her progress toward reunification took a major setback. By November, 1994 DCF had made a determination that since Michelle's relapse had been so profound and had continued for such a significant period of time, that it was appropriate to reconsider the issue of reunification. DCF made a decision that a permanency plan should be considered. DCF requested to know from the foster mother Lisa S. whether she would consider adopting the child if Tiffany was free for adoption. The foster mother, Lisa, and her husband indicated that they were favorably disposed to adopt Tiffany.
During the testimony of Lisa S., she indicated that she and her husband had been foster parents for 6 or 7 years now and that during that period of time there had been about 9 children who had remained with them on a temporary basis. Tiffany was placed there when she was 4 months old and during the last two and one-half years she has become a family member. At this point in time Lisa indicated she wants to adopt Tiffany because she loves her. She is her daughter in virtually all respects and she wants to adopt her. She indicates that she loves Tiffany and can't part with her. In the four days of testimony the word "love" was used only by the foster mother, who used it frequently.
Dr Mantell indicated that the foster family is the psychological family for Tiffany. He stated that removal of the child from this family would be the equivalent to a death experience for Tiffany; she would be a psychological orphan.
DISPOSITION
It is not sufficient to find that grounds for termination exist. The court must also determine, pursuant to § 17a-112(d), as amended, if a CT Page 7933 termination of parental rights is in the best interests of the child. The court must make this finding by clear and convincing evidence. In reRomance M., 30 Conn. App. 839, 847-48 (1993), appeal dismissed,229 Conn. 345 (1994). See also Practice Book § 1050.1(3). The statutory findings required by § 17-112(d) are not applicable to Michelle L. since she has consented to the termination of her parental rights but are required as to the male biological parent since he did not consent.
1) The Department of Children and Families has offered appropriate and timely services for transportation for visitation. For much of Tiffany's young life her male biological parent was incarcerated. It is believed that he received alcohol and drug treatment while in prison. While in prison he was asked about taking parenting classes, he admitted to never having cared for a child but stated: ".raising children is easy." Because of the sexually violent nature of his criminal charges, he was offered domestic violence counseling which he refused.
2) The court finds that the Department of Children and Families has made reasonable efforts to reunify this family given the situation and circumstances. The Department worked with the mother until it became very apparent that she was unable to conquer her very debilitating drug problems. The Department provided visitation services for the male biological parent until he was released from prison. Upon his release he made one visit and then disappeared from the child's life. His interest at this point is to have the maternal grandmother adopt Tiffany.
3) Regarding court orders, fulfillment of obligations, expectations and the like: The court finds that there were very few expectations for the male biological parent as he was not available as a placement resource and had very little interest in the child. As of January 7, 1994 he called DCF and announced that he wouldn't be having any further involvement with Tiffany. He subsequently unsuccessfully challenged the paternity of the child.
4) The child's feelings and emotional ties with the biological parent and foster parents were fully considered by the the court. The child is clearly bonded to her foster family. The court-appointed psychologist, Dr. Mantell, reports that the foster parents are the psychological parents to the children. There is no parental-child bonding with the biological parents.
5) With respect to the age of the child, Tiffany turned three on August 17, 1996. She is three years of age. This child requires stability in her life and an affirmation by the court that those people whom she considers her family will be her legal family. CT Page 7934
6) With respect to the efforts the parent has made to adjust his circumstances, conduct or conditions to make it in the best interest of the child to return to his home in the foreseeable future, the court finds that he has made no accommodation in his life to this child at all. He has no parental-type interest in the child. He is a stranger to the child.
7) With respect to any barriers which may have reasonably or unreasonably been placed in the path of the male biological parent to prevent a meaningful relationship with the child, the court finds that the Department of Children and Families has met its obligations to him by repeatedly offering a variety of services and visitation arrangements to him. His conduct reflects a complete lack of interest in having a relationship with this child.
ORDER
Having considered the foregoing facts, it is found by clear and convincing evidence to be in the best interests of Tiffany to terminate the parental rights of her biological parents so that the child may be placed in adoption, or that other permanent planning be accomplished without further delay. It is therefore ordered that the parental rights of Michelle are terminated by her consent. The parental rights of Richard M. are hereby are terminated on the grounds that Richard M., has failed to maintain a reasonable degree of interest, concern, or responsibility for Tiffany and he has abandoned the child as that term is defined in §17a-112(b)(1) and, further, that Richard M. has no ongoing parent/child relationship with Tiffany as that term is defined and described in §17a-112(b)(4) of the General Statutes. It is further ordered that the Commissioner of Children and Families be appointed the statutory parent for the purpose of placing Tiffany forthwith in adoption and to report to this court in writing as to the progress toward that end no later than ninety days from the date of this judgment. The court has heard with approval, the testimony regarding the relationship that exists between Tiffany and her present foster family. If for any reason the present foster family does not wish to adopt Tiffany or the Department of Children and Families wishes to consider any other adoptive resource, that fact shall be made known to this court promptly in writing and the case scheduled for an in-court review. If adoption has not been finalized within six months from the date of the judgment, the Commissioner is further ordered to submit a motion to review a plan for terminated child no later than that date to ensure compliance with federal law which mandates judicial review of every child in the guardianship of this state at least every eighteen months. CT Page 7935
Dated at Middletown, Connecticut this seventh day of October, 1996.
Foley, J.